# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KEIAUNA NORRIS,         )
)
    Plaintiff,         )
)
v.                         )     **Case No. 3:21-cv-00946**
)     **Judge Aleta A. Trauger**
GOSSHALL SYSTEMS, LLC,   )
)
    Defendant.       )

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 28) filed by defendant GossHall Systems, Inc. ("GossHall"), seeking judgment in its favor on plaintiff Keiauna Norris's claims of discrimination based on sex and pregnancy, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA"). For the reasons set forth herein, the motion will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are largely undisputed.[1] Goss Hall is a "last mile" delivery company headquartered in Elizabethtown, Kentucky. It is owned and operated by General Manager Sean Hall. GossHall uses delivery vehicles to complete final deliveries for Amazon in Kentucky, Tennessee, and surrounding areas. GossHall's payroll, safety, accounting, recruiting, dispatch, and operations personnel work at headquarters in Elizabethtown. Its other locations in Lexington,

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Resp. to SUF") (Doc. No. 35), admitting the facts or admitting them for purposes of summary judgment only. All facts set forth herein are either undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

Louisville, and Nashville house non-supervisory employees, such as drivers and fleet maintenance persons. GossHall has 70 employees at its Nashville location and 252 employees company-wide.

According to Sean Hall, all managers and supervisors with the authority to hire or fire GossHall employees work at GossHall's headquarters in Elizabethtown, and no employee in Nashville's GossHall facility can make termination decisions. (Doc. No. 28-2, Hall Aff. ¶ 4.) Norris purports to dispute this assertion, insofar as she asserts that the decision to terminate her was "influenced" by a co-worker at GossHall's Nashville facility named Nikki Mize. (*See* Resp. to SUF ¶ 6 (citing Doc. No. 28-3, Norris Dep. 93[2]).) However, Norris's testimony regarding her conversation with Mize, relayed in greater detail below, does not refute or call into question GossHall's assertion, supported by Sean Hall's Affidavit, that no employee in its Nashville facility had the authority to terminate any GossHall employee. Nor does it suggest that any employee at the Nashville facility had the power to influence hiring and firing decisions at the management level.

Norris resides in Nashville, Tennessee. She applied for a job at GossHall as a delivery driver in November 2020. During her initial Zoom interview with GossHall on November 17, 2020, Norris advised GossHall that she was seven months pregnant.[3] According to Norris, the interviewer's response was, "That's fine. There's nothing to worry about. If you need to do, like, light work during the job, you can talk to the supervisor on shift to let them know." (Doc. No. 28-3, Norris Dep. 32.) On November 18, 2020, Norris completed her second virtual interview with

---

[2] Norris's deposition transcript has been filed at least three times. (*See* Doc. Nos. 28-3, 29-6, 35-3.) The court will refer to the deposition by its original pagination rather than by CM/ECF document number or the pagination assigned by the court's electronic filing system.

[3] It is undisputed for purposes of the defendant's motion that Norris became pregnant in June 2020. (Doc. No. 35, Resp. SUF ¶ 17.) The parties fail to explain how it could also be true that she was seven months pregnant only five months later, but this is not a material discrepancy.

GossHall. Norris did not request any accommodation for her pregnancy during this interview and expressed no reservations about her ability to perform as a driver.

Norris was hired by GossHall after that interview and received a formal offer letter that outlined the job description and her responsibilities as a delivery driver. (*See* Doc. No. 28-4, Offer Letter.) She signed the offer letter on December 10, 2020, thus acknowledging that she understood that she would be expected to complete 200 to 300 stops per day, to lift packages weighing up to 50 pounds, and to complete the entire route assigned to her on any given day. Norris thought she could handle that work load.

Norris understood that she was an at-will employee, meaning that she could leave at any time and that GossHall could terminate her at any time.

It is undisputed that Norris never requested an accommodation and did not believe she ever needed an accommodation related to her pregnancy. (Norris Dep. 36 ("Q. Okay. So did you request any accommodation from GossHall? A. No. Because I didn't need it, or I felt like I didn't need it.").)

Norris attended virtual training sessions on December 14 and 15. (Doc. No. 28-2, Hall Aff. ¶ 8.) On December 16, she attended an in-person training session conducted by GossHall employee D'Anthanay Smith. (*Id.*) Norris discussed her pregnancy with Smith, who told her to let him know if she needed anything and confirmed that she would not have to lift anything over 50 pounds, which was within the 55-pound limit her doctor had given her. (*See* Norris Dep. 35.)

New GossHall drivers are typically given a "nursery route," or reduced route, for their first eight employment shifts. For the first four shifts, they are given a 50% reduced route, meaning they are only expected to deliver 50% of the usual number of packages, and for the subsequent four days, they deliver 85% of the normally expected number of packages. After that, they are

expected to "[h]it the [r]oad at 100% capacity." (Doc. No. 28-6, at 7, Training Presentation.) The 50% nursery routes are expected to be completed in an eight-hour shift, rather than the usual 10.5-hour shift.

Norris worked four shifts at GossHall. On her first day, Thursday, December 17, 2020, she was given a 50% nursery route. Although nursery routes are designed to take no more than eight hours, Norris's Time Detail Report reflects that she clocked in at 7:15 a.m., clocked out for lunch at 11:38 a.m., clocked in after lunch at 12:08 pm., and clocked out for the day at 7:20 p.m., meaning that she was on the clock for 11.58 hours on that day. (Doc. No. 28-9, Time Card; Doc. No. 28-2, Hall Aff. ¶ 10.) In addition, despite working well over eight hours, Norris was "rescued" while on that shift, meaning that a supervisor instructed another driver to take some of her packages and deliver them for her, to get the route done faster. (Doc. No. 28-2, Hall Aff. ¶ 10.) According to Hall, such "rescues" are "inherently inefficient and cost GossHall time, money, and resources." (*Id.*) Norris denies that the rescue was necessary and claims that she was "really almost done" by the time she was rescued around 3:00 in the afternoon (Norris Dep. 79), despite the unrefuted time card evidence that she did not clock out until after 7:00 p.m. that day. Norris did not remember how many hours she worked that day, but believed it was not "past nine" and "[p]robably eight and a half" hours. (*Id.* at 79, 80.)

Norris's next shift was on Saturday, December 19, 2020. She was given a "nursery route" this day too. (Doc. No. 28-2, Hall Aff. ¶ 11.) Her time card reflects that she clocked in at 7:05 a.m., clocked out and back in for a half-hour lunch break, and clocked out at 10:46 p.m., for a 15.2-hour shift. (Doc. No. 28-9, at 1.) Norris received two "rescues" that day, where other drivers retrieved and delivered some of her packages. (Doc. No. 28-2, Hall Aff. ¶ 11.) Norris thought these rescues

were unnecessary too. She claims that she was sent home early that day and denies that she worked a fifteen-hour shift. (Norris Dep. 82.)

Norris recalls that she completed her third shift on Sunday, December 20, 2020. (*Id.* at 83.) She was given a nursery route that day as well, and GossHall's records reflect that she was clocked in for 11.3 hours. (Doc. No. 28-9, at 1.) GossHall's records reflect that the lead driver, Nikki Mize, and another colleague, Brooke Rowland, exchanged texts on December 20, 2020 about Norris being "egregiously behind," "getting very irritated," and in need of coaching. (Doc. No. 28-11.)[4]

According to GossHall, Norris was also scheduled to work on Monday and Tuesday, December 21 and 22, 2020, but she "called out" both days, meaning she called to say she could not work. (*See* Doc. No. 28-10.) Norris did not recall missing two days. She believed that she had a doctor's appointment on one of those days and that the doctor gave her a note to turn in, "[s]o [she] turned it in." (Doc. No. 28-3, Norris Dep. 85.) She affirmed that she "always called" if she was not going to be able to work a shift. (*Id.* at 86.) She does not deny that she called out on at least one shift; she simply claims to have later provided a doctor's note to excuse her absence.[5]

The next day Norris worked was Wednesday, December 23, 2020. According to GossHall, Norris was not actually on the schedule to work that day because of her absences the two preceding days. (Doc. No. 28-2, Hall Aff. ¶ 13.) However, when she did show up, she was given another nursery route. (*Id.*) Norris states that she did not think she was assigned a nursery route that day

---

[4] The defendant's Statement of Undisputed Material Facts suggests that these texts took placed on December 23, 2020, but the exhibit on which the defendant relies shows that the exchange took place on December 20, 2020. (Doc. No. 28-11.)

[5] According to GossHall's Employee Handbook, GossHall uses a "point system" for "attendance issues," pursuant to which an employee earns a point for "missing a shift for any reason without 48 hour's notice, being late, or leaving early." (Doc. No. 28-5, at 3.) The handbook states that employees "may be required to bring in a doctor's note for calling in sick" and that the accumulation of three points "could lead to immediate termination." (*Id.*) It also states that "[a]ttendance issues are always at the discretion of management." (*Id.*)

but instead was assigned to work a full route and that she completed it in eight and one-half hours. (Norris Dep. 86–87.)

According to the plaintiff, she received a telephone call that night from a supervisor who she thought was named "Nikki," notifying her that she was being terminated. (Norris Dep. 89.) Norris was aware that the "lady that dropped off the uniforms" at the Nashville GossHall office was named Nikki, but she did not know if it was the same Nikki as the one who terminated her, did not know that GossHall employed two people named Nikki, and acknowledged that she had never met a supervisor named Nikki. (*Id.* at 89–90.) No reason was given for the termination. (*Id.* at 91–92.)

Niki Miller, an operations manager and supervisor who works at GossHall's headquarters in Elizabethtown, is the individual who made the decision to terminate Norris and who communicated that decision to Norris in a telephone call. Miller attests in an Affidavit that she never met Norris and had no knowledge prior to terminating her that she was pregnant. (Doc. No. 28-8, Miller Aff. ¶ 3.) According to Miller, it came to her attention in December 2020 that Norris, a new delivery driver at the Nashville GossHall facility, was "falling behind in her routes, had to be rescued by other drivers on multiple occasions, and had attendance issues." (*Id.* ¶ 4.) As these "work performance issues" were "costing GossHall time and money, making our operations inefficient," Miller "made the decision to terminate Ms. Norris' employment." (*Id.* ¶¶ 4, 5.) At the time, it was "GossHall's informal policy not to give an employee a reason for termination," and Miller did not tell Norris why she was being terminated. (*Id.* ¶ 5.) Miller states that Norris was terminated because of her poor job performance and that her pregnancy, of which Miller was unaware, had nothing to do with the decision. (*Id.* ¶ 6.)

Even though she did not give Norris a reason, Miller's contemporaneously created incident report states:

> Employee was on her fourth day on road after training. Employee was still on Level 1 nursery routes that are 50% of a normal 10 hour route. Employee was rescued each day on road multiple times. Employee was also working over the allotted average hours for a normal day even with multiple assists daily. In between the employees 3rd and 4th day working employee called out without any reasoning. After the employees 4th day of working I made the decision that the employee was not successful in completing a route as stated in the Job Offer letter and released her from employment.

(Doc. No. 29-3, at 2.)

Norris disputes Miller's testimony, citing a conversation she had with Nikki Mize, a lead driver at GossHall's Nashville facility who was not a supervisor and did not have authority to hire or fire. (Doc. No. 28-2, Hall Aff. ¶ 9.)[6] Norris alleges that, when Mize gave her her uniform sometime after her third shift, Mize saw that Norris was pregnant when she tried on the uniform jacket. She asked her how many months into her pregnancy she was. (Norris Dep. 91, 93.) When Norris told her, Mize allegedly said, "They hired you at seven-months' pregnant?" She seemed incredulous when Norris assured her that she had disclosed her pregnancy when she was hired. (*Id.* at 91, 93.) Mize allegedly said, "They normally don't do that." (*Id.* at 92.) Mize asked if Norris was sure she could do her job. When Norris replied, "Yeah, I've been doing it for the last three days," Mize told her, "I'm just going to let the—not the supervisor, but the main supervisor over the GossHall know." (*Id.*)[7] On the basis of this conversation, Norris believes that Mize told Miller that she was pregnant. (*Id.* at 95.) She also contends that the fact was generally not a secret. (*See id.* ("[E]verybody already knew. I did – I let the interviewer know and the training people know

---

[6] Norris was unaware when she was terminated that there were two individuals named Nikki/Niki at GossHall.

[7] Mize, to be sure, disputes this version of events. (Doc. No. 28-7.)

and the supervisor know during the shifts that I was driving and that I was pregnant.").) Norris believes this conversation happened on her last day of work. (*Id.* at 48.)

Norris concedes that the deadlines, delivery requirements, and nursery routes were the same for all employees. (Norris Dep. 133.) She nonetheless claims that GossHall demonstrated "more critical behavior toward" her (Doc. No. 35, Pl.'s Resp. SUF ¶ 70), but the citation she provides in support of that assertion, a work text thread from December 20, 2020, reflects the following exchange:

> Nikki Mize: For Norris to be that egregiously behind, it has to be deliberate.
>
> Brooke Rowland: @Nikki Mize we have been on the phone with her several times trying to figure out what is going on. She is getting very irritated. Can someone call her and coach her? See what see what is going on and coach her?
>
> Nikki Mize: Shoot me her number?
>
> Brooke Rowland: [Phone number redacted.]@Nikki Mize
>
> Katherine Phillip: I was about to say. Someone needs to call her. She's only done like 14 stops and it's 1:30pm. That's really not good. It doesn't help that she's in Ashland City[.]

(Doc. No. 29-4.) This text thread does not support the assertion that GossHall was "more" critical of Norris. Instead it shows that her co-workers were critical of her poor work performance.

Norris is not aware of any other new drivers who were "rescued" multiple times during their first few days of employment at GossHall and does not know of any similarly situated non-female or non-pregnant employees who were treated better than she was. (Norris Dep. 136, 127.) According to Sean Hall, Norris was not directly replaced, "person-for-person," after her termination. (Doc. No. 28-2, Hall Aff. ¶ 14.) Rather, many other drivers, both male and female, were hired during that late December 2020 time frame, which is GossHall's busy season. (*Id.*) He also attests that GossHall is an equal opportunity employer, has a maternity policy, and has had numerous employees get pregnant and remain employed. (*Id.* ¶ 16.)

On March 1, 2021, Norris filed a charge with the Tennessee Human Rights Commission, alleging pregnancy discrimination. The EEOC issued a right to sue letter on September 28, 2021. (*See* Doc. No. 1-1.) Norris filed this lawsuit on December 27, 2021. (Doc. No. 1.)

## II. RULE 56 STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P.

56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III. ANALYSIS

### A. Legal Standards

Norris brings a claim of discrimination under both Title VII and the PDA. Title VII prohibits employment discrimination based on sex, among other protected characteristics. Through the PDA, Congress amended Title VII to require that "women affected by pregnancy, childbirth or other related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work[.]" 42 U.S.C. § 2000e(k). A disparate treatment claim under the PDA requires the employee to show that her employer intentionally treated her "less favorably than employees with the 'complainant's qualifications' but outside the complainant's protected class." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015) (quoting *McDonnell Douglas*, 411 U.S. at 802).

Claims under both Title VII and the PDA that rely on circumstantial evidence are analyzed under the familiar burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006). Under *McDonnell Douglas*, the plaintiff first has the burden of proving a *prima facie* case of discrimination. If she does so, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant is able to articulate such a reason, the plaintiff then must offer evidence that, if believed, would establish that the proffered reason is a

"mere pretext for discrimination." *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996) (internal citations omitted).

A PDA plaintiff can establish a *prima facie* case of pregnancy discrimination by showing that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir. 2013) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)). Similarly, a Title VII plaintiff claiming sex discrimination can establish a *prima facie* case by showing that: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4). . . similarly situated non-protected employees were treated more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016).

The *prima facie* requirement "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The *prima facie* phase "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" *Hollins v. Atl. Co.*, 188 F.3d 652, 659 (6th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253–54), *abrogated in part by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

For either claim, to establish that a proffered reason for an adverse employment action was merely a pretext for discrimination, the plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (emphasis in original). In practice, a plaintiff can demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's actions, or (3) that they

were insufficient to motivate the employer's actions." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (internal quotations and citations omitted).

### B.     Application—PDA Claim

There is no dispute here that the plaintiff has satisfied the first three elements of her *prima facie* case under the PDA: she was pregnant, she was qualified for the job as a driver with GossHall, and she suffered an adverse employment action when her employment was terminated. The parties dispute whether she can establish the fourth element—a causal nexus between her pregnancy and the termination.

The only evidence of causality to which the plaintiff points is temporal proximity. More specifically, she alleges that she was fired the same day that the co-worker she identified as "Nikki" told her that GossHall "normally" does not hire people who are seven months pregnant, did not believe that Norris had disclosed her pregnancy when she was hired, and stated that she was going to "let the . . . main supervisor over the GossHall know." (Norris Dep. 92-93.) Norris surmises that Nikki Mize must have called Niki Miller, who then called to terminate her without telling her why.[8]

The Sixth Circuit has recognized that temporal proximity may "satisfy the nexus requirement in the pregnancy discrimination context." *Asmo*, 471 F.3d at 593. In cases in which the temporal proximity is "acutely near in time," temporal proximity alone may constitute circumstantial evidence of a causal connection. *Id.* at 593, 594 (citing *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)). In *Asmo*, the defendant made the decision to terminate the plaintiff

---

[8] She also invokes the "cat's paw" theory of liability, which applies when some individual other than the actual decisionmaker is "the driving force behind the employment action." *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1069 (6th Cir. 2015). As indicated above, however, no evidence supports this theory.

within two months of learning that she was pregnant with twins. *Id.* at 594. The court found that this close temporal relationship was "sufficient to establish a link between Asmo's pregnancy and her termination for purposes of a *prima facie* case." *Id.*

In this case, Miller denies having any knowledge of the plaintiff's pregnancy, but the plaintiff contends it was no secret that she was pregnant, as she disclosed the fact at each of her interviews and during her training sessions. Her *employer* thus knew she was pregnant, including the individual who made the hiring decision, but Miller denies that she personally knew about it. Regardless, viewing all of the facts in the light most favorable to the plaintiff for purposes of the defendant's Motion for Summary Judgment, the court must accept as true the plaintiff's allegations regarding her conversation with Nikki Mize, when Mize discovered that the plaintiff was pregnant. Based on the timing of events, if a jury believes that Mize made those statements, it could also believe that Mize called Miller or some other GossHall supervisor and that the decision was then made to terminate Norris. The very close proximity between these events, viewed in this light, is sufficient to establish the requisite causal nexus, for purposes of the plaintiff's *prima facie* case.[9]

The burden, accordingly, shifts to GossHall to proffer a legitimate, nondiscriminatory reason for terminating the plaintiff, which it has done. It asserts that the plaintiff was fired because she demonstrated an inability to adequately perform the requirements of her job as a driver, failing to finish even the "nursery routes" to which she was assigned during her first few shifts in a timely fashion and requiring multiple "rescues" or assistance from other drivers, and she called in absent during her first week at work. (Doc. No. 28-8, Miller Aff. ¶¶ 4–6.)

_____

[9] The fact that GossHall hired the plaintiff with the knowledge that she was seven months pregnant goes a long way toward negating the inference that it fired her because she was seven months pregnant, but at this juncture, again, the court views the facts in the light most favorable to the plaintiff.

The plaintiff asserts that the defendant's proffered reason did not actually motivate her termination. In support of this contention, she argues that, at the time she was terminated, the defendant "refused" to give her a reason and that the Sixth Circuit has held that an employer's changing rationale for an adverse employment decision can be evidence of pretext. *See, e.g.*, *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). She also insists that the defendant has not offered "concrete evidence" that her performance actually lacked.

The plaintiff, however, has not rebutted the defendant's assertion that it did not, as a matter of policy, provide a reason for termination at the time of termination, and its proffered reason—poor job performance—was documented in Niki Miller's contemporaneous incident report. (Doc. No. 29-3, at 2.) GossHall's reason for the termination has never changed.

In addition, the defendant has concrete evidence in the form of the plaintiff's time records, the accuracy of which the plaintiff does not dispute. Nor does she deny being rescued multiple times during her first couple of shifts. Instead, she denies that she needed rescuing, but the plaintiff's assertions that she did not need to be rescued are not supported by anything other than her own speculation and are refuted by the time records.

The plaintiff also argues that the proffered reason was not sufficient to motivate the termination, because GossHall's Employee Handbook provides for progressive discipline in relation to job performance as well as absences, and she was never provided a verbal or written warning prior to being terminated. The Handbook, however, also provides that "ALL EMPLOYMENT DECISIONS AND DISCIPLINARY ACTIONS ARE ULTIMATELY UP TO MANAGEMENT DISCRETION." (Doc. No. 28-5, at 13 (all caps in original).) Niki Miller has attested that she made the decision to terminate Norris after it was brought to her attention that this brand new employee was performing well below expectations, "costing GossHall time and

money," and making its "operations inefficient." (Doc. No. 28-8, Miller Aff. ¶ 4.) The plaintiff's claim that she did not need to be rescued is beside the point, because she has not shown that Miller knew that or had any reason to know that. The plaintiff, in short, has no basis for contesting Miller's reasonable belief that the plaintiff's performance was sub-par. As the Sixth Circuit has repeatedly explained, "so long as the employer honestly believed in the proffered reason given for its employment action" and that honest belief is "reasonably grounded on particularized facts that were before it at the time of the employment action," a plaintiff "cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial or baseless." *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 406 (6th Cir. 2008) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

The defendant, in sum, is entitled to summary judgment on the plaintiff's PDA claim, because the plaintiff has presented no evidence suggesting that GossHall's reason for terminating her was pretextual.

C.      **Sex Discrimination Claim**

The plaintiff cannot establish a *prima facie* case of sex discrimination, because she has not established that she was treated differently from any employees outside her protected class (female) or that she was replaced by someone outside her protected class. In response to GossHall's evidence that the plaintiff was hired and terminated during its busy holiday season and that it hired many people, male and female, during that time frame but did not hire a "person-for-person" replacement, the plaintiff argues that GossHall's evidence "falls short of identifying who replaced Plaintiff." (*See* Doc. No. 29, at 8.) She contends that GossHall cannot "meet the burden of disproving that Ms. Norris was in fact replaced by someone or [treated] less favorably than someone outside the protected class." (*Id.*) The plaintiff's argument fails to acknowledge that *she* has the burden to prove her *prima facie* case, however, and she presents no evidence that she was

subjected to disparate treatment or that she was actually replaced by someone outside her protected class.

Moreover, even if she had made out a *prima facie* case of sex discrimination, her Title VII claim would still fail for the same reason as her PDA claim: she cannot show that the defendant's proffered reason for terminating her was pretextual.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant GossHall's Motion for Summary Judgment. (Doc. No. 28.)

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge